Todd D. Weiler, #7671
Zachary C. Myers, #15302
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah  84111
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
todd.weiler@chrisjen.com
zachary.myers@chrisjen.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISEREE DEBENEDICTIS, | **COMPLAINT AND REQUEST FOR JURY TRIAL** |
| Plaintiff, | |
| v. | Civil No. 2:23-cv-00333 |
| UNITED AIRLINES, INC., | Judge David Barlow |
| Defendants. | Magistrate Judge Jared C. Bennett |

Plaintiff, Desiree DeBenedictis, respectfully allege for their Complaint and Jury Demand as follows:

### PARTIES

1.      On information and belief, Defendant, United Airlines, Inc. ("United"), is a corporation duly organized under the laws of, and in good standing with, the State of Delaware.

2.      Plaintiff, Desiree DeBenedictis, is a resident and citizen of the State of Utah.

### JURISDICTION AND VENUE

3.      This Court holds subject matter jurisdiction over this dispute under 28 U.S.C. § 1331.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Utah.

5.      This Court holds personal jurisdiction over Defendant because Defendant was doing business in Utah and this dispute arises from employment in Salt Lake County, Utah.

6.      This action is authorized and instituted pursuant to the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*; and Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140.

## ADMINISTRATIVE PREREQUISITES

7.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). On March 8, 2023, the EEOC notified Plaintiff of its intent to close its investigation and issue a right to sue letter. Thus, all administrative prerequisites have been met and exhausted.

8.      This case is timely filed.

## GENERAL ALLEGATIONS

9.      On February 25, 2020, Defendant, United Airlines, Inc. ("United"), unlawfully and willfully terminated Desiree DeBenedictis because of her age and/or race/national-origin.

10.      Ms. DeBenedictis grew up in the Philippines and moved to Utah in September 1994.

11.     She was hired by Continental Airlines (which eventually merged with United) on October 3, 1998 as a domestic agent. A few months later, she began working at the service recovery desk to assist passengers under IROP (irregular operations like weather, mechanical, *etc.*).

12.     In 2000, she started working as a support agent. She held many positions within Continental/United, including Beta testing and assisting in implementing a PSS (passenger service system). In 2012, she was assigned in Shanghai to assist sub-UA and offshore agents. She also held a position in the training department as part of a CISCO transition.

13.     Throughout her years with Continental/United, she has been constantly recognized as a top performer.

14.     Ms. DeBenedictis worked for United for approximately 20 years without a single disciplinary write-up, prior to the events giving rise to this action. She earned numerous accolades from coworkers, superiors, and satisfied customers.

15.     At the time of her termination her position was Lead Remote Reservation Sales and Service Representative ("Lead RSSR").

16.     As Lead RSSR, Ms. DeBenedictis was responsible for supporting and assisting with complex customer issues and escalations, providing advanced and day-of customer recovery support, and offering specialty sales and service for domestic, international, and premium reservations. The Lead RSSR position is largely remote and customer service inquiries are addressed via telephone and email, using United's "Kana" system, which gathers and assigns customer emails to Lead RSSRs. Lead RSSRs respond to customer emails via the Kana system (rather than their personal company email) or transfer it to another department, if the inquiry needs specialized attention. Once they have responded to the email, the Kana system marks that inquiry

3

as complete. Completed inquiries are units that United monitors to assess a Lead RSSR's productivity, which is reflected on a Scorecard. Lead RSSRs and their supervisors have access to these Scorecards, which are monitored to assess how Lead RSSRs are performing relative to their peers.

17.    On February 1, 2019, Ms. DeBenedictis Supervisor Kathy Fooshee met with Ms. DeBenedictis and a union representative. Ms. Fooshee criticized Ms. DeBenedictis performance, specifically accusing her of referring to many calls to other departments rather than addressing them herself.

18.    On February 25, 2019, Ms. Fooshee gave Ms. DeBenedictis a Termination Warning. In so doing, Ms. Fooshee skipped one or more steps in the disciplinary process. The normal disciplinary process starts with a verbal documented warning, then a written warning, then a termination warning.

19.    When issues were raised with another employee, Sharon Stratton's call performance, United gave Ms. Stratton a month of coaching. Ms. DeBenedictis was not offered a coaching program. Ms. Stratton was younger than Ms. DeBenedictis and was not Asian/Filipino.

20.    Almost a year later, on January 9, 2020, Ms. Fooshee met with Ms. DeBenedictis and her union representative again. This time Ms. Fooshee accused Ms. DeBenedictis of manipulating her Kana numbers by opening customer emails and then forwarding them to her personal work email. Ms. Fooshee claimed that this action caused Kana to mark the email as complete in the system. However, this was not "fraudulent," as United later claimed, because Ms. DeBenedictis did, in fact, respond to all customer Emails in a timely manner. Furthermore, there

4

was no way that Ms. DeBenedictis could have known that forwarding an Email from Kana would mark it as "complete" on the Scorecards—which are viewed by supervisors and not employees.

21.     As soon as Ms. DeBenedictis was told not to forward Emails from Kana to her United employee Email, she ceased this practice.

22.     On February 25, 2020, Ms. Fooshee fired Ms. DeBenedictis.

23.     Prior to her termination, Ms. DeBenedictis received only one five-hour training on the Kana software. She had never been told that it was against policy to transfer customer Emails from Kana to her company email and work on them from there. Ms. Fooshee was unable to show any policy or procedure that Ms. DeBenedictis had violated.

24.     Ms. DeBenedictis did not transfer any emails to a personal Email account (outside United).

25.     No one advised or coached Ms. DeBenedictis' about this specific issue prior to her termination. Ms. Fooshee failed to give Ms. DeBenedictis any prior warning that there was a problem. Ms. DeBenedictis was never removed from that task or told that she wasn't doing it right.

26.     When Ms. DeBenedictis worked on Kana , she made sure that she responded to all of the emails in a timely manner.

27.     Ms. DeBenedictis consistently performs her duties with competence. She went the extra mile and did more than was expected. Diseree received positive feedback throughout her career and was honored as a "United Customer Contact Center Outstanding Performer" in 2016 and in 2018. Indeed, United has admitted that prior to her termination, she "received high performance ratings and rewards and recognition." Her termination was for a first-time quasi-offense, which was extreme given the lack of evaluation and/or coaching.

28.     When other members of Ms. DeBenedictis team were accused of manipulating Kana, they were given progressive discipline, including verbal and written warnings.

29.     Ms. DeBenedictis' employment was subject to a collective bargaining agreement between United Airlines and The International Association of Machinists and Aerospace Workers (IAMAW), called the 2016-2021 Passenger Service Agreement ("PSA").

30.     Pursuant to the PSA, an employee cannot be "discharged without just cause." Furthermore, United was required to "conduct an investigatory meeting with an employee to discuss charges that, with reasonable foreseeability, could result in discipline. The Company will provide written notice to the employee of any such action, and will copy the Union on all such notices." Finally, United was required to follow "a progressive discipline system" and could only discharge an employee for a single offense if it was a "serious offense."

31.     The normal progressive disciplinary procedure is as follows:

In the event that the Company determines that an employee holding a Lead classification is not meeting the qualifications and performance requirements of the position, the following process will normally apply:
a. The Company will provide the employee with coaching and counseling that makes the employee aware of his/her performance deficiencies and the improvements or corrections required to bring his/her performance to acceptable levels to remain in the Lead position.
b. If the employee's performance does not improve to acceptable levels, the Company will provide targeted training reasonably calculated to assist the employee in making the required improvements or corrections.
c. If the employee continues to perform below acceptable levels, a written warning will document that fact and formally notify the employee that failure to correct his/her performance to a level meeting the qualifications and performance requirements of the Lead position will result in the employee being returned to the basic classification associated with the position. This written warning will remain in effect for 12 months, regardless of whether or when the Company determines that the employee either has improved to acceptable levels or should be returned to the basic classification.
d. At any time after issuance of the written warning while it remains in effect, the Company may return the employee to the basic classification based on its judgment

that the employee does not meet the minimally acceptable qualifications and performance requirements of the Lead position.

32.     United did not follow the procedures of the PSA before terminating Ms. DeBenedictis. There was no progressive discipline. Ms. DeBenedictis was told once not to forward Kana Emails to her work Email and was fired (despite having ceased this activity). There was no "coaching and counseling" period. There was no "targeted training." There was no "written warning."  Therefore, United violated the PSA.

33.     Furthermore, terminating Ms. DeBenedictis without following progressive discipline violated the PSA, because Ms. DeBenedictis alleged violation was not a "serious" violation—if it was serious then United would have a policy specifically forbidding forwarding Emails to work on them from an employee's work Email and would have instructed Ms. DeBenedictis accordingly. No such policy existed; No such instruction was ever given to Ms. DeBenedictis.

34.     Additionally, the PSA states: "No employee will be … discharged from employment without a prompt, fair and impartial investigative hearing at which he may be represented and assisted by Union Representatives. Prior to the hearing, the Company will give the Union and employee copies of any previous disciplinary action letters which are to be considered, and the Company will advise the Union in writing of the precise charges against the employee." The PSA provides that the employee may call witnesses at the hearing.

35.     Ms. DeBenedictis was not given a written explanation "of the precise charges against" her nor was she given an investigative hearing prior to her termination (nor was she able to provide witnesses for her defense). Therefore, United violated the terms of the PSA.

36.     Furthermore, Ms. DeBenedictis was treated differently than other similarly situated employees who were a different race and/or younger than her:

      a.  Lakeisha Wilson (black) was also found to have forwarded Kana emails. She was only issued a written warning and continued working for the company.

      b.  Linda Boswell (white) approximately was also found to have "manipulated" Kana emails but was only issued written warning and continued working for the company.

      c.  James Chlopick (white) was also working on Kana emails from his work Email. He was questioned, but only issued a termination warning and continued working for the company.

37.     Other employees who had issues with Kana were given a warning and received coaching. Other employees engaged in the same forwarding practice as Ms. DeBenedictis but were not terminated. Other employees with much worse records, including worse Scorecard metrics and with similar complaints of misusing the Kana system kept their jobs. Ms. DeBenedictis was treated differently because of her national-origin/race and age.

## FIRST CAUSE OF ACTION
**(Wrongful Termination in Violation of ADEA and Title VII of the Civil Rights Act of 1964—*McDonnel Douglas* Framework)**

38.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

39.     Plaintiff belongs to a protected class. Her race is Asian/Filipino. Her national origin is Filipino. Her age was 48 years-old at the time of termination.

40.     She was qualified for her job.

41.     Despite her qualifications, she was discharged by Defendant.

42.     The job was not eliminated after her discharge.

43.     On information and belief, Plaintiff's position was filled by a younger person (under 45 years old) who was not Filipino.

44.     There is evidence sufficient to prove that Defendant's decision to terminate Plaintiff was based on illegal discriminatory criterion or discriminatory animus based on Plaintiff's race and/or national origin and/or race. Specifically, as described above, Plaintiff was treated differently than other similarly situated employees who were younger and not Asian/Filipino. Other employees who had the same or similar issues with the Kana system were not immediately terminated like Plaintiff. Instead, Defendant gave these younger, non-Filipino employees warnings, followed progressive discipline procedures required by contract, and allowed other employees to keep their jobs.

45.     Defendant terminated Plaintiff's employment in violation of the ADEA, 29 U.S.C. § 621, *et seq.* and Title VII, 42 U.S.C. § 2000e, *et seq.*

46.     The reasons proffered by Defendant for terminating Plaintiff's employment are a pretext for its discriminatory termination.

47.     As a direct and proximate result of Defendant's discriminatory termination of Plaintiff, Plaintiff suffered damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Employment Discrimination (Disparate Treatment) in Violation of ADEA and Title VII of the Civil Rights Act of 1964)

48.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

49.     Plaintiff is a member of a protected class. Her race is Asian/Filipino. Her national origin is Filipino. Her age was 48 years-old at the time of termination.

50.     Plaintiff suffered adverse employment action—Defendant terminated her employment.

51.     Plaintiff met her employer's legitimate expectations at the time of the adverse employment action.

52.     Defendant treated Plaintiff differently from similarly situated employees outside her protected class. Specifically, as described above, Plaintiff was treated differently than other similarly situated employees who were younger and not Asian/Filipino. Other employees who had the same or similar issues with the Kana system were not immediately terminated like Plaintiff. Instead, Defendant gave these younger, non-Filipino employees warnings, followed progressive discipline procedures required by contract, and allowed other employees to keep their jobs.

53.     The reasons proffered by Defendant for terminating Plaintiff's employment are a pretext for its discriminatory termination.

54.     Defendant terminated Plaintiff's employment in violation of the ADEA, 29 U.S.C. § 621, *et seq.* and Title VII, 42 U.S.C. § 2000e, *et seq.*

55.     As a direct and proximate result of Defendant's discriminatory termination of Plaintiff, Plaintiff suffered damages in an amount to be proved at trial.

### THIRD CAUSE OF ACTION
### (ERISA Violation)

56.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

57.     Defendant engaged in prohibited conduct for the purpose of interfering with the attainment of a right to which Plaintiff may become entitled under an employee benefit plan, Title I of ERISA, or the Welfare and Pension Plans Disclosure Act. Specifically, Defendant terminated Plaintiff on the eve of her pension vesting to prevent her from becoming entitled to pension payments.

58.     If Plaintiff had not been terminated her CARP pension benefits would have vested within less than two years.

59.     Defendant's desire to defeat pension eligibility was a motivating factor behind Plaintiff's termination. There is evidence sufficient to prove that Defendant's decision to terminate Plaintiff was based on illegal discriminatory criterion or discriminatory animus based on Plaintiff's proximity to pension vesting. Specifically, as described above, Plaintiff was treated differently than other similarly situated employees who were further from having pension rights vest. Other employees who had the same or similar issues with the Kana system were not immediately terminated like Plaintiff. Instead, Defendant gave these employees warnings, followed progressive discipline procedures required by contract, and allowed other employees to keep their jobs.

60.     The reasons proffered by Defendant for terminating Plaintiff's employment are a pretext for its wrongful action to prevent Plaintiff's pension rights from vesting.

61.     Defendant terminated Plaintiff's employment in violation of Section 501 of ERISA, 29 U.S.C. § 1140.

62.     As a direct and proximate result of Defendant's violation of Section 501 of ERISA, Plaintiff suffered damages in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against United)

63.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

64.     Plaintiff and Defendant formed a legally binding employment contract.

65.     Plaintiff substantially complied with her obligations under the contract.

66.     Defendant breached the implied covenant of good faith and fair dealing by terminating Plaintiff's employment before her CARP pension vested for the purpose of denying Plaintiff the benefit of the bargain. Defendant acted in bad faith, including bypassing normal progressive discipline procedures.

67.     As a direct and proximate result of Defendant's breach, Plaintiff has incurred damages in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and award her relief as follows:

A.  Direct and consequential damages for breach of contract in an amount to be determined at trial;

B.  Compensatory damages for lost past and future earnings and benefits (including pension benefits) in an amount to be determined at trial;

C.  General damages for embarrassment, emotional turmoil, and shame caused by Defendant's discriminatory acts;

D.  Pre-judgment and post-judgment interest;

E.  Punitive damages in an amount to be determined at trial;

F.  Attorney fees and costs permitted by contract, statute, or other applicable law; and

G.  Such other and further relief as the Court deems equitable and just under the circumstances.

## REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable.

/ / /

/ / /

DATED this 24th day of May, 2023.

CHRISTENSEN & JENSEN, P.C.

*/s/ Zachary C. Myers*
Todd D. Weiler
Zachary C. Myers
*Attorneys for Plaintiff*